IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

DAOUD BOONE, # 276751,                    )
                                          )
                Petitioner,               )
                                          )
        v.                                )   Civil Action No. 2:15cv556-EMC
                                          )              [WO]
CHERYL PRICE, *et al.*,                   )
                                          )
                Respondents.              )

## RECOMMENDATION OF THE MAGISTRATE JUDGE

Acting *pro se*, state inmate Daoud Boone brings this petition for writ of habeas corpus under 28 U.S.C. § 2254 challenging his capital murder conviction entered in the Circuit Court of Montgomery, Alabama in November 2010. Doc. 1. Boone was sentenced to life in prison without the possibility of parole. For the reasons that follow, it is the recommendation of the Magistrate Judge that Boone's § 2254 petition be denied without an evidentiary hearing and this case dismissed with prejudice.

## I.  BACKGROUND

### Trial Results

Boone was originally tried in September 2009 for capital murder and possession of a controlled substance. In that trial, Boone was found guilty on the drug possession charge, but the judge granted a mistrial on the capital murder charge because of a hung jury. *See* Doc. 9-1 at 1. A new trial on the capital murder charge was held in November 2010. On November 23, 2010, the jury returned a verdict finding Boone guilty of capital murder in

violation of Alabama Code § 13A-5-40(a)(17), which makes murder by use of a deadly weapon while the victim is in a vehicle a capital offense. Doc. 11-3 at 16.  On that same date, the trial court sentenced Boone to life in prison without the possibility of parole. Doc. 11-18 at 53.

### Summary of Trial Evidence

The State presented evidence that on the night of November 13, 2007 Boone approached his girlfriend, Sylvia Perry, in the parking lot of Igor's, a Montgomery nightclub where Perry performed as a dancer, and shot her in her car.  The bullet entered Perry's left upper shoulder, perforated her heart and lungs, and exited through her right breast.  Perry was rushed to a local hospital but died shortly thereafter.  Boone and Perry had been involved in an intimate relationship.  However, they did not go to the nightclub together on the night Perry was killed, and evidence indicated that they argued earlier on the day of the shooting.  Boone was on active duty in the United States Navy and dated Perry before leaving Montgomery to serve in Korea.  In November 2007, he was back in town on leave before reassignment.

Sharmaine Dulany was at Igor's when the shooting took place. Doc. 11-12 at 99. From where she stood inside the nightclub, Dulaney saw a dark-colored car, which she said resembled a Dodge Stratus, pull up behind Perry's car in the parking lot. Doc. 11-12 at 103–08.  The car had circled the building two or three times before stopping. Doc. 11-12 at 104.  Dulaney saw a man wearing a hoodie-type jacket get out of the car, but she could not see his face. Doc. 11-12 at 105–06 & 110.  The man was waving his arms and appeared

to be angry. Doc. 11-12 at 106.  Dulaney then heard a gunshot and saw gunfire from a gun in the man's hand. Doc. 11-12 at 106.  After the gunshot, Dulaney saw the man get back in his car and spin away. Doc. 11-12 at 106.  At trial, Dulaney was shown State's Exhibit 10, a photograph of a black Chrysler Cirrus belonging to Boone's mother. Doc. 11-12 at 108–09.  Dulaney testified that the car in the picture resembled the car she saw the shooter driving on the night of November 13, 2007. Doc. 11-12 at 109.

Damion Stowes, a friend of Perry's who worked with her at Igor's, was inside the nightclub when the shooting occurred.  While he was inside, Stowes heard gunshots. Doc. 11-12 at 53.  Someone came inside saying Perry had been shot.  Stowes went outside and found Perry in her car, leaning against the steering wheel and breathing shallowly. Doc. 11-12 at 54.  Perry was bleeding from her nose and mouth, and blood was running from her shoulder down her arm. Doc. 11-12 at 56.  Stowes moved Perry over so he could get in the driver's seat and rushed her to the hospital. Doc. 11-12 at 54–55.  Stowes testified that as he drove Perry to the hospital, she asked him where "D" was and told him "my boyfriend shot me."[1] Doc. 11-12 at 56.  Perry died shortly after arriving at the hospital. Doc. 11-12 at 58.

Keith Campbell, who worked as a doorman and security guard at Igor's on the night of the shooting, testified that he rushed outside the nightclub after hearing several gunshots. Doc. 11-12 at 118–19 & 128–30.  Campbell saw what he described as a dark-blue, four-

---

[1] Elsewhere in his testimony, Stowes explained that Perry would refer to Boone as her boyfriend in conversation and that he never heard her refer to anyone but Boone as her boyfriend. Doc. 11-12 at 45–46.

door, mid-size sedan leaving the scene at a high rate of speed. Doc. 11-12 at 130–31. According to Campbell, there was enough light shining through the car's window for him to see its driver, whom he identified as Boone. Doc. 11-12 at 133–35. Campbell stated that the car pictured in State's Exhibit 10 (the black Chrysler Cirrus belonging to Boone's mother) resembled the car he saw speeding away from Igor's. Doc. 11-12 at 133. Campbell's testimony indicated that the shooting took place sometime after 11:00 or 11:30 p.m. on November 13. *See* Doc. 11-12 at 124; *see also* Doc. 11-12 at 69.

Another security guard at Igor's, Henry Kenney, testified that he was standing outside the nightclub when he saw a man pull up in a car behind Perry's car, get out, and fire a gun at Perry. Doc. 11-12 at 178–79. Kenney heard two shots. Doc. 11-12 at 179. Kenney identified Boone as the man he saw shoot Perry. Doc. 11-12 at 179–80. According to Kenney, Perry was running toward her car when Boone shot at her, although Perry managed to get in her car. Doc. 11-12 at 178–79 & 200–01; Doc. 11-13 at 2 & 15. As Boone fled the scene in his car, Kenney pulled out his own pistol and fired several shots at Boone. Doc. 11-12 at 180–82; Doc. 11-13 at 9. However, Kenney said he did not hit Boone's car when he fired. Doc. 11-12 at 182; Doc. 11-13 at 9–10. Kenney identified a photo of Boone's mother's car, a black Chrysler Cirrus, as the car he saw Boone driving. Doc. 11-12 at 182–84.

Also identifying Boone as the shooter was Antonio Relf, who was talking with friends outside Igor's when the incident occurred. *See* Doc. 11-13 at 37–38. Just before the shooting, Relf saw what he described as a black Chrysler or Dodge Cirrus pull up

4

behind Perry's car in Igor's parking lot. Doc. 11-13 at 45–46.  The car's driver got out, and when one of Relf's friends said the man had a gun, people scattered. Doc. 11-13 at 47.  Relf took cover behind some motorcycles parked near Igor's entrance. Doc. 11-13 at 47–48.  Relf testified that he saw the man walk up to Perry's car and fire a gun into a closed window. Doc. 11-13 at 48–49 & 60.  Relf saw Perry's head jerk backward and then forward. Doc. 11-13 at 60.  According to Relf, he clearly saw the man who shot Perry because there were lots of car headlights on in the parking lot and Igor's had outside lighting. Doc. 11-13 at 49–50.  Relf identified the shooter as Boone. Doc. 11-13 at 50–51.  Relf testified that prior to the night of the shooting, he had never seen Boone before. Doc. 11-13 at 51.  Relf's testimony indicated that the shooting took place sometime after 11:00 or 11:30 p.m. on November 13. Doc. 11-13 at 38.

Perry's best friend, Cyntoria "Tori" Taylor, testified that in the months before Perry's death, Perry dated two men in Montgomery: Boone and a man named David Ross. Doc. 11-13 at 144.  Taylor referred to Boone as Perry's "supposed to be fiancé." Doc. 11-13 at 144.  Taylor said she did not think the relationship between Perry and Ross was "exclusive" for either party. Doc. 11-13 at 145.  According to Taylor, earlier on the day of Perry's death, Perry came to her house with a black eye. Doc. 11-13 at 148–52.  She then went with Perry to Boone's mother's house to pick up Boone and drive him to a car rental company at the airport. Doc. 11-13 at 154–55.  On the way to the airport, however, Boone got angry when Perry told him that her car was low on gas; Boone had Perry turn around and drop him off instead at a friend's place in the Southlawn area of town. Doc. 11-13 at

156–57.  Shortly thereafter, Boone called Perry's cell phone and told her to come pick him up. Doc. 11-13 at 158–59.  According to Taylor, Perry was upset and crying after getting this call. Doc. 11-13 at 157–58.  Taylor accompanied Perry when she went to pick up Boone, although she said didn't care for Boone because he was "mean" to Perry. Doc. 11-13 at 158–59.

Taylor testified that when she and Perry returned to the Southlawn area to pick up Boone around 8:00 p.m. that evening, Boone rebuffed Perry's attempt to hug him and told Perry to move to the passenger seat of her car so he could drive. Doc. 11-13 at 159–60 & 168.  Around the same time, Taylor noticed her own boyfriend, Willie Dillard (who lived in the area), walking up to the car with some friends. Doc. 11-13 at 160–61.  When Boone saw Dillard and the others, he demanded to know if Taylor had set him up to be "jumped." Doc. 11-13 at 160–61.  Boone got out of the car, pulled a handgun from his waistband, and approached Dillard. Doc. 11-3 at 161–62.  Perry and Taylor got out of the car and sat on the trunk. Doc. 11-3 at 162.  According to Taylor, Boone talked to Dillard for a few minutes, while holding the gun and taking the bullet clip out and putting it back in. Doc. 11-3 at 162–63.  At one point, Boone, apparently satisfied that Dillard meant him no harm, let Dillard hold the clip. Doc. 11-3 at 162–63.

Taylor testified that when Boone finished talking to Dillard, Boone walked back to where she and Perry were sitting and struck Perry in the face with the back of his hand. Doc. 11-13 at 163–64. Taylor stated that Perry fell to the ground and Boone started kicking Perry in the stomach, back, and face. Doc. 11-13 at 164.  When Perry hollered for help,

Dillard came over and pulled Boone away from her. Doc. 11-13 at 165.  Boone then told

Perry to get back in the car or he would drive away and leave her. Doc. 11-3 at 166.  Perry

got in the car, and Boone continued to hit her. Doc. 11-13 at 166–67.  Boone then drove

away with Perry. Doc. 11-13 at 167.

Willie Dillard provided testimony corroborating Taylor's account of events in

Southlawn on the evening of November 13, including Boone's beating and kicking of

Perry. *See* Doc. 11-4 at 8–13.  Dillard identified the pistol Boone carried that evening as a

.45 caliber Hi-Point. Doc. 11-13 at 200–01; Doc. 11-14 at 2.  Dillard testified that when he

asked Boone why he was arguing with Perry, Boone replied, "Shorty got my head going,"

indicating he was angry with Perry for messing with his head, and complained about having

bought Perry "a lot of things" while he was away in Korea serving in the Navy. Doc. 11-4

at 8–9 & 13.

After Perry was shot, Montgomery Police Officer Douglas H. Herman received a

"be on the lookout" radio dispatch over his patrol car radio, at about 12:43 a.m., naming

and describing Boone, providing the street address of Boone's mother, and giving a vehicle

description. Doc. 11-15 at 7–9.  Herman drove directly to Boone's mother's residence on

McElvy Street in Montgomery. Doc. 11-15 at 8–9.  Herman estimated it would take 10 to

15 minutes for someone to drive from Igor's to McElvy Street in light traffic conditions.

Doc. 11-15 at 10.  When Herman arrived at Boone's mother's house, he saw a Nissan

Sentra—which did not fit the vehicle description he had been given—parked in the

driveway, so he drove past. Doc. 11-15 at 11.  Herman drove around the neighborhood

7

looking for the described vehicle and came back to Boone's mother's house about five minutes later. Doc. 11-15 at 14.  This time, he saw a second vehicle parked in the driveway, "a black Dodge," which had not been there when he passed by five minutes earlier. Doc. 11-15 at 14–15.  Shortly after noticing the Dodge, Herman saw a man on McElvy Street, about four or five houses down from Boone's mother's house, walking away from the house. Doc. 11-15 at 15–17.  This man fit the description Herman had been given of Boone. Doc. 11-5 at 17.  Herman stopped his patrol car. 11-15 at 17.  The man identified himself as Boone, and Herman placed Boone under arrest. Doc. 11-15 at 18.  Herman testified that it was approximately 1:10 a.m. when he came in contact with Boone and arrested him. Doc. 11-15 at 21.  He identified a photo of Boone's mother's car as looking like the car he saw parked in the driveway the second time he drove past Boone's mother's house on McElvy Street. Doc. 11-15 at 25–26.

Torris Tellis, a friend of Boone's since junior high, testified that he hung out with Boone in November 2007 when Boone was back in Montgomery on a break from his deployment in the Navy. Doc. 11-15 at 47.  During this time, Tellis said, Boone would drive his mother's car, which looked like the same car depicted in the photo of Boone's mother's Chrysler Cirrus. Doc. 11-15 at 47.  Tellis testified that Boone knocked on the door of his apartment in the early morning hours of November 14, 2007, waking him up. Doc. 11-15 at 49–51.  Tellis opened the door for Boone, and Boone came in and said something about being shot at while at Igor's. Doc. 11-15 at 52–53 & 67.  Tellis

acknowledged that he was not wide awake when Boone came by his apartment. Doc. 11 at 53 & 59.

Tellis also testified that he was with Boone on another occasion when Boone bought a .45 caliber handgun at a pawnshop. Doc. 11-15 at 55–56.  The parties stipulated that Boone purchased two Hi-Point .45 caliber handguns from the same pawnshop, one on January 3, 2007, and one on November 3, 2007. Doc. 11-15 at 69–70.  Tellis said he did not see Boone with a gun when he showed up at his apartment in the early morning hours of November 14. Doc. 11-15 at 57.

E.E. Howton, a homicide investigator with the Montgomery Police Department, testified that a bullet recovered inside Perry's car, with Perry's DNA on it, appeared to have been fired from a .45 caliber handgun. Doc. 11-16 at 50; *see* Doc. 11-14 at 172; Doc. 11-15 at 168.  Boone never turned over his .45 caliber gun to the police, and the police could not find Boone's gun during their investigation. Doc. 11-16 at 51, 64 & 97–99. Consequently, no test could be run comparing the bullet recovered from Perry's car with Boone's gun. Doc. 11-16 at 50–51.

The defense argued that the testimony from the State's witnesses identifying Boone as the shooter was unreliable, was rife with inconsistencies, and was the product of suggestive photo lineup procedures conducted by the Montgomery Police Department. The defense also argued that the State's witnesses were improperly influenced to identify Boone as the shooter after seeing Boone's picture on a local television news broadcast following his arrest.  The defense presented testimony from an expert witness who

maintained that the photo lineup procedures employed by the police in Boone's case were unduly suggestive and that the witness identifications of Boone were unreliable. The defense also sought to suggest that another individual, David Ross, who was involved in a relationship with Perry in the months before her death, may have been the person who shot Perry at the nightclub.

### Direct Appeal

Boone appealed his conviction and sentence, raising claims that (1) the State used its peremptory strikes in a racially discriminatory manner, in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986); (2) the trial court erred in denying his motion for a judgment of acquittal alleging the State's failure to prove venue; and (3) the trial court erred in denying his motion for a mistrial alleging that the prosecutor improperly commented on his post-arrest, post-*Miranda* silence. Doc. 11-19.

On August 17, 2012, the Alabama Court of Criminal Appeals issued a memorandum opinion affirming Boone's conviction and sentence. Doc. 9-1. Boone applied for rehearing, which was overruled on September 7, 2012. Docs. 11-21 & 9-3. Boone then filed a petition for writ of certiorari with the Alabama Supreme Court, which that court denied on January 14, 2013. Docs. 11-22 & 9-5.

### Rule 32 Petition

On December 10, 2013, Boone filed a *pro se* petition in the trial court seeking post-conviction relief under Rule 32 of the Alabama Rules of Criminal Procedure. *See* Doc. 11-23 at 10. Boone's Rule 32 petition raised the following claims:

1.  Appellate counsel was ineffective for failing to argue that the trial court erred in allowing the admission of unduly prejudicial prior-bad-act evidence.

2.  Appellate counsel was ineffective for failing to argue that the trial court erred in allowing unreliable witness identification testimony.

3.  Appellate counsel was ineffective for failing to argue that the prosecutor improperly commented on Boone's post-arrest, post-*Miranda* warnings silence.

4.  Trial counsel was ineffective for failing to present Tahirah Boone and KeRae Sagers as alibi witnesses.

5.  Trial counsel was ineffective for failing to object to the trial court's flawed qualification of potential jurors.

6.  Trial counsel was ineffective for failing to object to the trial judge's improper contact with jurors.

7.  Trial counsel was ineffective for failing to object to the prosecutor's improper vouching for a State's witness during closing argument.

8.  Trial counsel was ineffective for failing to object to the trial court's jury instruction amending the indictment.

9.  Trial counsel was ineffective for failing to argue that the capital murder statute under which Boone was convicted is unconstitutionally vague.

10. Trial and appellate counsel were ineffective for failing to pursue the issue whether Boone could be impeached with his 2009 felony drug possession conviction, causing Boone to waive his right to testify.

Doc. 11-23 at 4–68.

The State moved to dismiss Boone's Rule 32 petition, asserting that his claims lacked specificity under Rule 32.6(b)[2] and did not state proper claims of ineffective assistance of counsel. Doc. 11-24 at 44–48.  The State also pleaded that Boone's claims were time-barred under Rule 32.2(c) (precluding claims raised in an untimely petition). Doc. 11-14 at 48–49.

On February 21, 2014, the trial court entered an order summarily denying Boone's Rule 32 petition. Doc. 11-24 at 52–54.  In its order, the trial court found that Boone's claims of ineffective assistance of counsel concerned strategic choices made by counsel and did not entitle Boone to any relief. Doc. 11-24 at 52–53.  The trial court further found that any of Boone's claims imputing trial court error (as opposed to deficient counsel) were barred by the time limitation in Alabama Rule of Criminal Procedure 32.2(c). Doc. 11-24 at 54.

Boone appealed, filing a *pro se* brief in which he disputed the allegations in the State's response to his Rule 32 petition and argued that the trial court erred by failing to hold an evidentiary hearing on his claims of ineffective assistance of counsel. Doc. 11-25 at 5–6 & 9–12.  In this regard, Boone alleged broadly that his counsel's strategic decisions are not insulated from review under the *Strickland* standard for claims of ineffective assistance of counsel. Doc. 11-25 at 5–9.  In particular, Boone reasserted his claim that his trial counsel was ineffective for failing to present his alibi witnesses. Doc. 11-25 at 7–9.

---

[2] Rule 32.6(b) provides: "Each claim in the [Rule 32] petition must contain a clear and specific statement of the grounds upon which relief is sought, including full disclosure of the factual basis of those grounds. A bare allegation that a constitutional right has been violated and mere conclusions of law shall not be sufficient to warrant any further proceedings." Ala. R. Crim. P. 32.6(b).

Boone also cursorily reasserted claims regarding (1) his appellate counsel's failure to argue that (a) the trial court erred in allowing prejudicial prior-bad-act evidence and (b) the prosecutor improperly elicited testimony that Boone failed to turn his gun over to the police, and (2) his trial counsel's failure to object to (a) the trial court's flawed qualification of potential jurors and (b) the trial judge's improper contact with jurors. Doc. 11-25 at 9–12. However, Boone's brief contained no argument to support these claims. Finally, Boone argued that the trial court improperly denied his Rule 32 petition before 14 days had passed after the State filed its motion to dismiss the petition. Doc. 11-25 at 12–13.

On March 6, 2015, the Alabama Court of Criminal Appeals issued a memorandum opinion affirming the judgment denying Boone's Rule 32 petition. Doc. 9-6. Setting forth its reasoning in affirming the trial court's judgment, the Alabama Court of Criminal Appeals stated:

> On appeal, Boone failed to argue the merits of any of his claims. He disputed the State's response to the petition and the allegations in that response. Boone argued that Claim (1) (alleging that defense counsel's not objecting to prejudicial information being placed before the jury constituted ineffective assistance of counsel) was not refuted by the State; however, he did not argue the validity of the claim itself.

> In a similar fashion, Boone criticizes the State for an improper response to Claim (3) [alleging that appellate counsel was ineffective for failing to argue that the prosecutor improperly commented on Boone's post-arrest, post-*Miranda* silence], but fails to argue the merits of the claim. Boone does discuss Claim (4) [alleging that trial counsel was ineffective for failing to present Tahirah Boone and KeRae Sagers as alibi witnesses] in some detail, but he fails to cite any relevant authority. He cited some authority not germane to the issue, a case stating that a client is entitled to set the parameters of his counsel's representation.

13

Boone lastly argues on appeal that the circuit court improperly dismissed his petition before fourteen days had passed, and that he was entitled to respond to the State's motion before the circuit court ruled. We first note that none of Boone's claims presented jurisdictional issues. We further note that Boone's claims were not precluded by the limitations period of Rule 32.2(c), as pleaded by the State and found as to some claims by the circuit court.

With regard to petitioner's claim that the circuit court erred in dismissing his claims without first allowing him an opportunity to respond to the State's motion to dismiss, this court has recently addressed this precise issue in *Mashburn v. State*, 148 So. 3d 1094 (Ala. Crim. App. 2013), and held that Rule 32 does not require a circuit court to permit petitioner to file a response to the State's answer or motion to dismiss.

> "'Rule 32.7(a), Ala. R. Crim. P., allows the State 30 days to file a response to the Rule 32 petition. There is, however, no provision in Rule 32 for the petitioner—who, pursuant to Rule 32.6(b), Ala. R. Crim. P., should have included the full factual basis for his request for relief and each of his legal assertions in his Rule 32 petition—to file a reply to the State's response.'" (quoting *Jenkins v. State*, 105 So.3d 1234 (Ala. Crim. App. 2011), aff'd, 105 So. 3d 1250 (Ala. 2012)).

148 So. 3d 1094 at 1114.

Because Rule 32 does not require the circuit court to wait for a response to the State's motion before summarily dismissing a petition, Boone's claim is without merit.

Moreover, Boone has failed to comply with Rule 28(a)(10), Ala. R. App. P., which requires that an argument contain "the contentions of the appellant/petitioner with respect to the issues presented, and the reasons therefor, with citations to the cases, statutes, other authorities, and parts of the record relied on." Further, "[a]uthority supporting only 'general propositions of law' does not constitute a sufficient argument for reversal." *Beachcroft Properties, LLP v. City of Alabaster*, 901 So. 2d 703, 708 (Ala. 2004), quoting *Geisenhoff v. Geisenhoff*, 693 So. 2d 489, 491 (Ala. Civ. App. 1997). "An appellate court will consider only those issues properly delineated as such and will not search out errors which have not been properly preserved or assigned. This standard has been specifically applied to briefs containing general propositions devoid of delineation and support

from authority or argument." *Ex parte Riley*, 464 So. 2d 92, 94 (Ala. 1985) (citations omitted). *See also Spradlin v. Spradlin*, 601 So. 2d 76, 78–79 (Ala. 1992) (holding that citation to a single case with no argument as to how that case supports the appellant's contention on appeal was insufficient to satisfy Rule 28(a)(5), Ala. R. App. P., now Rule 28(a)(10), Ala. R. App. P.); and *Hamm v. State,* 913 So. 2d 460, 486 (Ala. Crim. App. 2002) (noncompliance with Rule 28(a) (10) has been deemed a waiver of the claims on appeal).

Therefore, Boone has waived consideration of the circuit court's dismissal of his petition on appeal.

A circuit court may summarily dismiss a petitioner's Rule 32 petition pursuant to Rule 32.7(d), Ala. R. Crim. P.,

"[i]f the court determines that the petition is not sufficiently specific, or is precluded, or fails to state a claim, or that no material issue of fact or law exists which would entitle the petitioner to relief under this rule and that no purpose would be served by any further proceedings, the court may either dismiss the petition or grant leave to file an amended petition."

*See also, Hannon v. State*, 861 So. 2d 426, 427 (Ala. Crim. App. 2003); *Cogman v. State*, 852 So. 2d 191, 193 (Ala. Crim. App. 2002); *Tatum v. State*, 607 So. 2d 383, 384 (Ala. Crim. App. 1992).  Because the petitioner's claims were precluded, or were without merit, summary disposition was appropriate.

For the foregoing reasons, the judgment of the circuit court is due to be affirmed.

Doc. 9-6 at 4–6 (footnote omitted).

Boone applied for rehearing, which the Alabama Court of Criminal Appeals overruled on May 22, 2015. Docs. 11-21 & 9-8.  On July 24, 2015, the Alabama Supreme Court denied Boone's petition for writ of certiorari. Docs. 11-22 & 9-9.

## § 2254 Habeas Petition

On July 28, 2015, Boone initiated this habeas action by filing a § 2254 petition asserting the following claims:

1.  The prosecutor improperly commented on Boone's post-arrest, post-*Miranda* warnings silence.

2.  Trial counsel was ineffective for failing to present Tahirah Boone and KeRae Sagers as alibi witnesses.

3.  Trial and appellate counsel were ineffective for failing to pursue the issue whether Boone could be impeached with his 2009 felony drug possession conviction, causing Boone to waive his right to testify.

4.  Trial counsel was ineffective for failing to object to the trial court's jury instruction amending the indictment.

5.  Trial counsel was ineffective for failing to argue that the capital murder statute under which Boone was convicted is unconstitutionally vague.

6.  Appellate counsel was ineffective for failing to argue that the trial court erred in allowing unreliable witness identification testimony.

Docs. 1 & 2 at 3–53.

## II.   DISCUSSION

### A.   The AEDPA Review Standard

"When it enacted the Antiterrorism and Effective Death Penalty Act of 1996 ('AEDPA'), Congress significantly limited the circumstances under which a habeas petitioner may obtain relief." *Hardy v. Allen*, 2010 WL 9447204, at *7 (N.D. Ala. Sep. 21, 2010).  To prevail on a § 2254 claim adjudicated on the merits by the state courts, a petitioner must show that a decision by the state courts was "contrary to, or involved an

unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or was "based on an unreasonable determination of the facts, in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1) & (2); *see Williams v. Taylor*, 529 U.S. 362, 404–05 & 412–13 (2000).

A state court's decision is "contrary to" federal law if it fails to apply the correct controlling authority or applies the controlling authority to a case involving facts "materially indistinguishable" from those in a controlling case, but nonetheless reaches a different result. *Williams*, 529 U.S. at 404–06; *Bell v. Cone*, 535 U.S. 685, 694 (2002). And a state court's decision is an "unreasonable application" of federal law if it correctly identifies the governing rule but then applies it to a new set of facts in a way that is objectively unreasonable, or it extends or fails to extend a clearly established legal principle to a new context in a way that is objectively unreasonable. *Williams*, 529 U.S. at 407.

"Objectively unreasonable" means something more than an "erroneous" or "incorrect" application of clearly established law, and a reviewing federal court may not substitute its judgment for the state court's even if the federal court, in its own independent judgment, disagrees with the state court's decision. *See Williams*, 529 U.S. at 411; *Lockyer v. Andrade,* 538 U.S. 63, 76 (2003).  The reviewing court "must determine what arguments or theories supported or . . . could have supported[ ] the state court's decision; and then it must ask whether it is possible fair minded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Harrington v. Richter*, 562 U.S. 86, 102 (2011).  "This is a 'difficult to meet,' and 'highly

deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt.'" *Cullen v. Pinholster*, 536 U.S. 170, 181 (2011) (internal citations omitted).

Federal courts likewise are directed to determine whether the state court based its findings on "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).   A federal court "may not characterize these state-court factual determinations as unreasonable 'merely because [we] would have reached a different conclusion in the first instance.'" *Brumfield v. Cain*, 135 S. Ct. 2269, 2277 (2015) (citation omitted).   A state court's determination of a factual issue is "presumed to be correct," and the habeas petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

### 1.   *Doyle Claim: Comment on Post-Arrest, Post-Miranda Warnings Silence*

Boone claims that the trial court erred to reversal by allowing the prosecutor to comment on his silence after receiving his *Miranda v. Arizona*, 384 U.S. 436 (1966), warnings in violation of *Doyle v. Ohio*, 426 U.S. 610 (1976). Doc. 2 at 3–23.   In *Doyle*, the United States Supreme Court held that using a defendant's post-arrest, post-*Miranda* warnings silence as evidence of guilt violates the Due Process Clause of the Fourteenth Amendment. *See* 426 U.S. at 618–19.

Boone sought a mistrial (which the trial court denied) based on an alleged *Doyle* violation by the prosecutor and then pursued the issue on direct appeal.   The Alabama Court

of Criminal Appeals discussed the issue at length before finding that no *Doyle* violation

occurred in Boone's case.  The state appellate court explained:

> In his brief before this Court, Boone points out that during the direct examination at trial of E.E. Howton, who was an investigator with the Montgomery Police Department at the time Perry was killed, the following occurred:
>
>> "[Prosecutor]: Now, with respect to your investigation and the information you got from the interviews, what action did you take next in your investigation?
>>
>> "[Howton]: Well, after getting the interviews done, and Mr. Kenney, the security guard [at Igor's], made an ID of Mr. Boone as being the individual he saw out there shooting Ms. Perry, I took Mr. Boone back into the interview room to interview him.  We read him his *Miranda* warnings.
>>
>> "[Defense counsel]: I'm going to object, Judge.  May we approach?
>>
>> "The Court: Sure.
>>
>> "(Bench conference outside the hearing of the jury as follows:)
>>
>> "[Defense counsel]: He is about to testify that the defendant said he wanted a lawyer and did not give a statement, which would be a comment on the defendant's silence, and it would be violation of his Constitutional rights to do that.
>>
>> "[Prosecutor]: That was not my intention to elicit—
>>
>> "The Court: Make sure he doesn't say it."
>
> (R. 945-46.)  [(Doc. 11-6 at 29–30.)]
>
> Boone further points out that later, during the continued direct examination of Howton, the following occurred:

"[Prosecutor]: Have you been in court previously whenever there has been testimony about [the defendant] having a .45 caliber gun?

"[Howton]: Yes.

"[Prosecutor]: In the course of—let me just ask you this. Did the defendant ever bring you the .45 caliber gun of which he owned?

"[Howton]: No.

"[Prosecutor]: Did he ever tell you—

"[Defense counsel]: Judge, we're going to object.

"The Court: Sustained.

"[Defense counsel]: —and move for a mistrial.  May I approach?

"The Court: Sure.

"(Bench conference outside the hearing of the jury as follows:)

"[Defense counsel]: He has made a comment on the defendant's silence, which is grounds for a mistrial.  He knew what he was doing.  I had already come up here and the Court sustained my objection to not elicit anything from him.  Now when this officer answers whether or not—he's commenting on the defendant's silence, did the defendant ever come to you and say—and did he ever tell you—"

[(Doc. 11-16 at 51–52.)]

After that exchange, defense counsel and the prosecutor argued about whether Boone had given up his right to have his post-*Miranda* warnings silence not used against him when he chose to testify at his first trial, which ultimately had ended in a mistrial on the murder charge.  After a lengthy discussion, the trial court denied Boone's motion for a mistrial.

20

Contrary to Boone's argument, in the above-cited passages, no violation of the *Doyle* rule occurred.  To support his argument Boone cites *Doyle* and *Qualls [v. State*, 927 So. 2d 852 (Ala. Crim. App. 2005)].

In *Qualls*, this Court set forth the testimony that occurred at trial, as follows:

> "The appellant argues that the State improperly elicited testimony that he did not make a statement to law enforcement officers after he was arrested.   During the State's cross-examination of the appellant, the following occurred:

>> "'[PROSECUTOR]:  And when you talked to the deputies or the police, they gave you an opportunity to make a statement, didn't they?

>> "'[THE APPELLANT]: Yes, sir—No, sir they didn't.  They never did.  I never did make a statement.'

> "(R. 462–63.)  The appellant moved for a mistrial, but the trial court denied the motion.  The appellant also made a motion in limine to prevent the State from eliciting testimony that he had not made any statements and had not waived his Fifth Amendment rights before trial, which the trial court also denied.  Subsequently, during its rebuttal, the State recalled one of the officers who had arrested the appellant, and the following occurred:

>> "'[PROSECUTOR]:  Did you give [the appellant] an opportunity to make a statement?

>> "'[DEFENSE COUNSEL]: Object.

>> "'[WITNESS]: Ask that again.

>> "'[PROSECUTOR]:  Did you read [the appellant] his rights?

>> "'[DEFENSE COUNSEL]: Object.

>> "'[WITNESS]: Yes, I did.

"'[PROSECUTOR]: Did he make a statement?

"'[DEFENSE COUNSEL]: Object and move for a mistrial.

"'THE COURT: Same ruling.

"'[WITNESS]: No, he didn't.'"

*Qualls*, 927 So. 2d at 855.  This Court then ultimately held that under the specific facts of this case, "any violation of *Doyle* was harmless." *Id*. at 856.

In *Doyle*, two defendants were arrested together and charged with selling marijuana.  The defendants were given the *Miranda* warnings on arrest and did not complain to the arresting officer that they had been framed.  However, at their separate trials, the defendants gave an exculpatory story that they had been framed.  On cross-examination, the prosecutor specifically questioned each defendant at his respective trial concerning why he had not told the frameup story to the arresting officer when he arrested the defendants.  Defense counsel objected to these questions, but those objections were overruled and each defendant was required to answer.  On appeal from the defendants' convictions, the United States Supreme Court held that the use for impeachment purposes of the defendants' silence, at the time of their arrest and after they had received *Miranda* warnings, violated the Due Process Clause of the Fourteenth Amendment. *Doyle*, 426 U.S. at 613–19.

In the present case, unlike the situations in *Qualls* or *Doyle*, no comments were ever made in front of the jury regarding Boone's post-arrest, post-*Miranda* warnings silence.  At one point, Howton simply stated that he had read Boone his *Miranda* warnings.  That statement was immediately followed by an objection that was sustained by the trial court before any further testimony was given.  Later, the prosecutor asked Howton: "Did the defendant ever bring you the .45 caliber gun of which he owned?"  Howton responded: "No."  The prosecutor then started to ask Howton: "Did [Boone] ever tell you—."  However, that question was interrupted by an objection, which was also sustained by the trial court before any further testimony was given.  Boone's post-arrest, post-*Miranda* warnings silence was never mentioned.  Based on the testimony that the jury heard at trial, there is no way for the jury to even know that Boone was in fact silent after he was arrested and given the *Miranda* warnings, much less consider that silence as

22

> evidence of his guilt.  The information concerning his silence was simply never elicited.  Therefore, no violation of the *Doyle* rule occurred, and, thus, the trial court did not err in denying Boone's motion for a mistrial.

Doc. 9-1 at 13–17.

Here, Boone has not rebutted the presumption of correctness given to a state-court determination of facts. *See* 28 U.S.C. § 2254(d)(e)(1).  The Alabama Court of Criminal Appeals' determination that the prosecutor made no actual comment in front of the jury regarding Boone's post-arrest, post-*Miranda* warnings silence finds ample support in the record and was not "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings." *See* 28 U.S.C. § 2254(d)(2).  Further, applying the "highly deferential" standard for evaluating state-court rulings, which demands that this court give state-court decisions the benefit of the doubt, *see Pinholster*, 536 U.S. at 181, and not substitute its judgment for the state court's, *see Williams*, 529 U.S. at 411, this court finds that the Alabama Court of Criminal Appeals' decision holding that no *Doyle* violation occurred in Boone's case was not "contrary to, or . . . an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States. *See* 28 U.S.C. § 2254(d)(2).  Consequently, Boone is not entitled to habeas relief on his claim that the trial court erred to reversal by allowing the prosecutor to comment on his post-arrest, post-*Miranda* warnings silence.

### 2.     *Counsel's Failure to Present Alibi Witnesses*

Boone contends that his trial counsel rendered ineffective assistance by failing to call his sister, Tahirah Boone, and his niece, KeRae Sagers, as alibi witnesses at his trial.

Doc. 2 at 23–32.  According to Boone, both witnesses were prepared to testify on his behalf that he was at Tahira Boone's residence when Sylvia Perry was shot and therefore could not have committed the crime. Doc. 2 at 23–24.  Boone states that both witnesses testified to the same effect at his first trial, which ended with a hung jury on the capital murder charge. Doc. 2 at 23–24.  He claims that both witnesses intended to provide the same testimony at his second trial and both expected to be called to the stand by his defense counsel. Doc. 2 at 23–24.  Boone maintains that testimony from the two uncalled witnesses would have created a reasonable doubt as to his guilt and that his lawyers' failure to present their testimony constituted ineffective assistance of counsel. Doc. 2 at 23–32.

Boone submits affidavits from Tahirah Boone and KeRae Sagers, in which both aver they were with Boone at Tahira's house on November 13, 2007, into the early morning of November 14, 2007; that Boone left Tahira's house on foot after 12:00 a.m. that morning, walking to his mother's house several blocks away; that they later learned Boone was arrested as he walked to his mother's house; that the shooting of Perry allegedly occurred between 11:00 p.m. and 12:00 a.m.; and that they were prepared to testify that Boone was at Tahira's residence when the crime allegedly occurred but were never called to testify. *See* Docs. 2-5 & 2-6; Doc. 11-23 at 65–66.

Boone asserted his claim that his trial counsel was ineffective for failing to present Tahirah Boone and KeRae Sagers as alibi witnesses in his Rule 32 petition.  In denying relief on the claim, the trial court found:

> [T]he court finds that the Petitioner's allegation that his trial counsels were
> ineffective because they did not call his niece and his sister to testify at trial

is without merit. The Petitioner's counsels were presumably aware of the existence of these witnesses and the content of their proposed testimony since they testified in the first trial and a transcript existed of that previous testimony. The decision, therefore, not to call particular witnesses to testify was strategic. "Strategic choices made after a thorough investigation of relevant law and facts are virtually unchallengeable." *Boyd [v. State*, 746 So. 2d 364,] at 375 [(Ala. Crim. App. 1999)]. "The fact that a particular defense was not successful does not prove ineffective assistance of counsel." *Miller v. State*, 99 So.23d 349 (Ala. Crim. App. 2011) (quoting *Chandler v. United States,* 218 F.3d 1305, 1314 (11th Cir. 2000). The Petitioner has failed to meet his burden of establishing that his counsel's performance was deficient under *Strickland [v. Washington*, 466 U.S. 668 (1984),] and his claims of ineffective assistance of counsel, therefore, are denied.

Doc. 11-24 at 53.

As previously noted, in Boone's appeal from the denial of his Rule 32 petition the Alabama Court of Criminal Appeals found Boone's claim that his counsel was ineffective for failing to present these alibi witnesses was, like his other claims of ineffective assistance, insufficiently argued in his *pro se* brief to warrant further review, so that the state appellate court held Boone had waived consideration of his ineffective assistance claims by failing to comply with the requirements for appellate briefs set forth in Rule 28(a)(10) of the Alabama Rules of Appellate Procedure. Doc. 9-6 at 5–6. Although (as discussed later) this court does not take issue with the Alabama Court of Criminal Appeals' assessment of the deficiencies of Boone's Rule 32 appeal brief regarding his other allegations of ineffective assistance of counsel, the court finds that Boone's claim about the uncalled alibi witnesses was presented with sufficient factual specificity and clarity of argument in his Rule 32 appeal brief (and in his Rule 32 petition and the instant habeas petition) to warrant consideration on the merits.

It was, in part, this determination that Boone's uncalled alibi witness claim is set forth with suitable specificity and clarity in his Rule 32 appeal brief that led the court to enter orders directing the attorneys who represented him at trial, Jeffery C. Duffey and Susan G. James, to submit affidavits addressing Boone's claim that they rendered ineffective assistance of counsel by failing to call Tahirah Boone and KeRae Sagers to testify at his trial on the capital murder charge. Doc. 14.  Because there was no evidentiary hearing on Boone's Rule 32 petition, where Duffey and James might have expounded on their trial strategy, and Duffey and James were not called upon to submit affidavits in response to this claim when it was asserted in Boone's Rule 32 petition, the reasons for counsels' decision not to call these witnesses do not necessarily leap from the pages of the record.  Unfortunately, the affidavits submitted to this court by Duffey and James shed little light on the issue.  Duffey states that his files from Boone's case contain no notations indicating why Tahirah Boone and KeRae Sagers were not called as witnesses and that he has no independent recollection (from a trial that took place more than seven years ago) of why the two were not called to testify.[3]  Doc. 18.  James, too, states that her case files contain no notations indicating why Tahirah Boone and KeRae Sagers were not called as witnesses and that, like Duffey, she has no independent recollection of why the two were not called. Doc. 23.

The state trial court, reasoning that Duffey and James knew of the existence of Tahirah Boone and KeRae Sagers as potential witnesses and of the likely content of their

---

[3] Duffey also represented Boone on direct appeal.

expected testimony, since the two testified at Boone's first trial and a transcript of that first proceeding was available to Duffey and James,[4] found that the decision by Duffey and James not to call Tahirah Boone and KeRae Sagers was the product of a deliberate strategic choice to forgo their testimony at Boone's second trial. Doc. 11-24 at 53.  And since strategic choices made after investigation of the relevant facts and law are "virtually unchallengeable," *see Strickland v. Washington*, 466 U.S. 668, 690–91 (1984), the trial court concluded that Boone had failed to satisfy the "deficient performance" prong of the *Strickland* standard for claims of ineffective assistance of counsel. Doc. 11-24 at 53.  This court, however, finds it unnecessary to assess whether the decision by Duffey and James not to call Tahirah Boone and KeRae Sagers was the product of a reasoned strategic choice, because, upon careful review of the record, the court finds that Boone fails to demonstrate a reasonable likelihood that he was prejudiced by his attorneys' failure to call these witnesses to testify at his second trial.

## *Strickland* Standard for Ineffective Assistance of Counsel

A claim of ineffective assistance of counsel is evaluated against the two-part test announced by the Supreme Court in *Strickland v. Washington*.  First, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 689.  Second, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would

---

[4] Boone was represented by different attorneys at his first trial.  It is apparent from the transcript of Boone's retrial that Duffey and James were familiar with testimony of witnesses who testified at the first trial because they make references to the prior testimony at various points in the record.

have been different." *Id.* at 694; *see Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000).

Scrutiny of counsel's performance is "highly deferential," and the court indulges a "strong presumption" that counsel's performance was reasonable. *Chandle*r, 218 F.3d at 1314 (internal quotation marks omitted). The court will "avoid second-guessing counsel's performance:  It does not follow that any counsel who takes an approach [the court] would not have chosen is guilty of rendering ineffective assistance." *Id.* (internal quotation marks and brackets omitted).  "Given the strong presumption in favor of competence, the petitioner's burden of persuasion—though the presumption is not insurmountable—is a heavy one." *Id.*

As noted, under the prejudice component of *Strickland,* a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694.  A "reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*  The prejudice prong does not focus only on the outcome; rather, to establish prejudice, the petitioner must show that counsel's deficient representation rendered the result of the trial fundamentally unfair or unreliable. *See Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993) ("[A]n analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective."). "Unreliability or unfairness does not result if the ineffectiveness of counsel does not

deprive the defendant of any substantive or procedural right to which the law entitles him." *Id*. at 372.

Unless a petitioner satisfies the showings required on both prongs of the *Strickland* inquiry, relief should be denied. *Strickland,* 466 U.S. at 687.  Once a court decides that one of the requisite showings has not been made, it need not decide whether the other one has been satisfied. *Id.* at 697; *see Duren v. Hopper*, 161 F.3d 655, 660 (11th Cir. 1998).

<u>**Boone Fails to Satisfy *Strickland*'s Prejudice Prong**</u>

As stated above, Duffey and James put on a defense focused on attempting to show that the testimony from State's witnesses who identified Boone as the person they saw shoot Sylvia Perry was unreliable, filled with inconsistencies, and the product of suggestive photo lineup procedures conducted by the police.  To this end, Duffey and James presented testimony from an expert in evaluating eyewitness testimony, Allen Kenneth Hess, who maintained that the photo lineup procedures used by the police in Boone's case were unduly suggestive and that the witness identifications of Boone as the shooter were therefore unreliable. *See* Doc. 11-16 at 167–201; Doc. 11-17 at 2–7.  Duffey and James also argued that the State's witnesses were swayed to identify Boone as the shooter after seeing Boone's picture on a local television news broadcast shortly after his arrest.  Duffey and James also sought to suggest that David Ross, who had recently been involved in a relationship with Perry, was the person who shot and killed Perry at the nightclub and then drove away from the scene.

Besides attempting to undermine the eyewitness identifications of Boone as the shooter, Duffey and James presented testimony from Boone's mother, Mary Boone, seeking to place Boone away from the scene of the shooting—and at Tahira Boone's house—when Perry was shot. *See* Doc. 11-17 at 49–67.  Mary Boone testified that Boone spent the night of November 13, 2007 with her daughter Tahira at Tahira's house five or six blocks away from her own house. Doc. 11-17 at 52–53 & 55–56.  In an attempt to bolster the defense claim that Boone never left the area of his sister's house during the late hours of November 13, Duffey also elicited testimony from Mary Boone that only she and her husband had keys to her black Chrysler Cirrus and that Boone did not have keys to the car and did not drive it on the day of the shooting. Doc. 11-17 at 50–51.  On cross-examination, Mary Boone insisted that the Chrysler Cirrus never left her driveway on the evening of November 13 and early morning hours of November 14 and that Boone never drove her car after he returned to Montgomery from Korea in November 2007. Doc. 11-17 at 54–55.  She maintained that Boone's friend Torris Tellis was "confused" if he testified that Boone regularly drove her car in November 2007 when he was in Montgomery on leave from the Navy (Doc. 11-17 at 54–55) and that Officer Herman was "lying" when he testified that the car was not in her driveway when he first drove past in the early morning hours of November 14 but was in her driveway when he drove by again five minutes later, shortly before coming upon Boone walking in a direction away from her house. Doc. 11-17 at 60–61.

The jury also heard a reading of Boone's own prior testimony, who testified at his first trial but chose not to testify at the second trial.  In his testimony, Boone stated that he stayed at his sister Tahirah Boone's house "all night" on the evening of November 13, 2007, and left Tahirah's house only once, to walk back to his mother's house, at which point he was arrested by Officer Herman while walking in the street. Doc. 11-17 at 103–07.

Under these circumstances, testimony from Boone's sister Tahirah Boone and Boone's niece KeRae Sagers that they were with Boone at Tahira's house on November 13, 2007 into the earning morning hours of November 14, 2007 would not have differed in a substantial way from, and was effectively cumulative to, the evidence actually presented through Mary Boone's testimony and through Boone's prior testimony.  Through Mary Boone and through Boone himself, the jury was squarely presented with testimony claiming that Boone stayed at his sister Tahirah's house all night on the evening of November 13, and that he left Tahirah's house only for the brief time he began to walk to his mother's house, just before he was arrested.  Through Mary Boone, the jury was squarely presented with testimony claiming that her car—which the State argued was the car Boone drove to Igor's to shoot Perry before returning it to his mother's house—never left her driveway on the evening of November 13 and early morning hours of November 14, bolstering the defense claim that Boone never left the area of his sister's house late on the night of November 13.  The jury was presented with a straightforward credibility choice.  Presented with testimony claiming that Boone was at his sister's house when the

shooting of Perry allegedly occurred, the jury disbelieved this defense argument and credited the State's evidence, which included the testimony of several disinterested witnesses who testified they saw Boone shoot Perry. *See Robins v. Fortner*, 698 F.3d 317, 330 (6th Cir. 2012) (failure to present non-family member alibi witness was not prejudicial, in part because it was cumulative to the testimony given by petitioner's mother and sister).

Moreover, alibi testimony from Tahirah Boone and KeRae Sagers, family members (like Mary Boone) with an evident interest in the outcome of the proceedings, would have been subject to impeachment. The transcript from Boone's first trial reflects that Tahirah Boone testified at that proceeding that Boone left her house to walk to their mother's house at around 3:00 a.m. in the morning of November 14, after which he was arrested. Doc. 26-1 at 152 & 172–73. However, this testimony appears to have been a misguided attempt by Tahirah to establish her brother's presence at her house throughout the night, since, without dispute, Boone was arrested by Officer Herman walking down the street, away from his mother's house, at around 1:10 a.m. on the morning of November 14. Had she testified at Boone's second trial, Tahirah would have been particularly vulnerable to impeachment based on this testimony from Boone's first trial. Alibi testimony from interested family members containing significant inconsistencies with the facts adduced at trial is obviously less valuable than the testimony of a disinterested witness. *See United States ex rel. Emerson v. Gramle*y, 883 F. Supp. 225, 236–39 (N.D. Ill. 1995). Moreover, during cross-examination at Boone's first trial, Tahirah acknowledged that she remained in her bedroom for most of the night of November 13, while Boone was supposedly in the living room

watching a movie with her children and her niece, KeRae Sagers. Doc. 26-1 at 168–69 & 172.  KeRae Sagers was 12 years old when she testified at Boone's first trial and was ten years old when Sylvia Perry was shot.  Her testimony maintaining that she was awake until about 1:00 a.m. on the morning of November 14, 2007 watching a movie with Boone and her cousins would have been subject to impeachment based on her obvious interest in providing a defense for her uncle.  Also, as already noted, this testimony would effectively have been cumulative to other evidence actually presented to (and rejected by) the jury at Boone's second trial.

Finally, the case against Boone—and the evidence discrediting the alibi testimony of family members—was strong, as chronicled by the testimony of numerous disinterested witnesses who (1) testified they saw Boone shoot Sylvia Perry in the parking lot of Igor's; (2) testified they saw Boone driving a car at the scene of the shooting that looked like Boone's mother's car; and (3) provided circumstantial evidence that Boone's mother's car was not at her residence at around 1:00 a.m. on the morning of November 14 but appeared in her driveway a few minutes later, after which Boone was discovered a short distance away walking in the direction away from his mother's house.  In addition, the State provided evidence that Boone appeared at Torris Tellis's door in the early morning hours of November 14 and said he had been shot at while at Igor's.  Evidence indicated Perry was killed by a bullet fired from a .45 caliber gun, and testimony established that Boone owned a .45 caliber handgun, which he was seen with on the evening of November 13.

Testimony also established that Boone was angry with Perry and, only a few hours before she was shot, had beaten Perry and kicked her after knocking her to the ground.

Under the circumstances, it is not reasonably probable that the verdict at Boone's second trial would have been different had his sister and niece testified. *See Smith v. Jago*, 888 F.2d 399, 409 (6th Cir. 1989) ("[W]e do not believe that [the witness'] testimony, in light of its dubious credibility . . . would be sufficient to raise a reasonable doubt in the mind of the jurors."); *United States v. Hubbard*, 22 F.3d 1410, 1422–23 (7th Cir. 1994) ("[G]iven the overwhelming evidence, a new trial is unlikely to lead to an acquittal."). Upon careful review of the record, the court finds that Boone fails to demonstrate a reasonable likelihood that he was prejudiced by his attorneys' failure to call Boone's sister and niece to testify at his second trial.  Consequently, Boone fails to sustain this claim of ineffective assistance of counsel, and he is not entitled to habeas relief on this claim.

B.      **Procedural Default: Adequate and Independent State Ground**

Boone's § 2254 petition contains four remaining claims: (1) that his trial and appellate counsel were ineffective for failing to pursue the issue of whether he could be impeached with his 2009 felony drug possession conviction, supposedly causing him to waive his right to testify; (2) that his trial counsel was ineffective for failing to object to the trial court's jury instruction purportedly amending the indictment; (3) that his trial counsel was ineffective for failing to argue that the capital murder statute under which he was convicted is unconstitutionally vague; and (4) that his appellate counsel was ineffective for failing to argue that the trial court erred in allowing unreliable witness

identification testimony.  The respondents correctly argue that each claim is procedurally defaulted. Doc. 9 at 7–9.

Federal habeas review may be unavailable for claims that a state appellate court has rejected on state procedural grounds. *Coleman v. Thompson*, 501 U.S. 722, 729 (1991). When a state prisoner fails to follow state procedural rules, thereby procedurally defaulting on a claim, the authority of federal courts to review the prisoner's state-court criminal conviction is "severely restricted." *Johnson v. Singletary*, 938 F.2d 1166, 1173 (11th Cir. 1991).  "Federal review of a petitioner's claim is barred by the procedural-default doctrine if the last state court to review the claim states clearly and expressly that its judgment rests on a procedural bar, and that bar provides an adequate and independent state ground for denying relief." *Atkins v. Singletary*, 965 F.2d 952, 955 (11th Cir. 1992); *see Marek v. Singletary*, 62 F.3d 1295, 1301–02 (11th Cir. 1995).

> By its very definition, the adequate and independent state-ground doctrine requires the federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law. *See Fox Film Corp. v. Muller*, 296 U.S. 207, 210 (1935).  Thus, by applying this doctrine to habeas cases, [*Wainwright v. Sykes*, 433 U.S. 72 (1977)] curtails reconsideration of the federal issue on federal habeas as long as the state court explicitly invokes a state procedural bar rule as a separate basis for decision.  In this way, a state court may reach a federal question without sacrificing its interests in finality, federalism, and comity.

*Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989).

### <u>Rule 28(a)(10), Alabama Rules of Appellate Procedure</u>

Here, after the trial court denied Boone's Rule 32 petition, the Alabama Court of Criminal Appeals affirmed the trial court's judgment based on the failure of Boone's Rule

32 appeal brief to comply with Rule 28(a)(10) of the Alabama Rules of Appellate Procedure.  Rule 28(a)(10) provides, in pertinent part, that an argument in an appellant's brief must "contain[ ] the contentions of the appellant/petitioner with respect to the issues presented, and the reasons therefor, with citations to the cases, statutes, other authorities, and parts of the record relied on." Ala. R. App. P. 28(a)(10).  In applying Rule 28(a)(10), the Alabama Court of Criminal Appeals explained that Boone failed to argue the merits of any of his claims in his Rule 32 appeal brief and that, therefore, such claims were deemed waived for purposes of appeal.  Boone's Rule 32 appeal brief is contained in the record. Regarding the four claims noted above, Boone's brief is accurately described by the Alabama Court of Criminal Appeals.

"The purpose of Rule 28, Ala. R. App. P., outlining the requirements for appellate briefs, is to conserve the time and energy of the appellate court and to advise the opposing party of the points he or she is obligated to make." *Ex parte Borden*, 60 So.3d 940, 943 (Ala. 2007).  After all, the Alabama Supreme Court has explained that "[i]t is not the function of this Court to do a party's legal research or to make and address legal arguments for a party based on undelineated general propositions not supported by sufficient authority or argument." *Id.* (citations omitted); *see also Wagner v. State*, 197 So.3d 517, 520 n.3 (Ala. 2015) ("It is well settled that it is not the function of this Court to create legal arguments for the parties before us.").  As such, "[t]o obtain review of an argument on appeal, an appellant must provide citations to relevant cases or other legal authorities and an analysis of why those cases or other authorities support an argument that an error

occurred and that the alleged error should result in reversal." *Alonso v. State*, 228 So.3d 1093, 1108 (Ala. Crim. App. 2016) (citations omitted).  "[T]he purpose of Rule 28(a)(10) is to require appellants to do their own heavy lifting, and in this manner to obviate the need for state appellate courts to perform an appellant's research for him, to generate and develop an appellant's arguments for him, or to engage in guesswork or speculation as to why—exactly—the appellant believes the lower court got it wrong." *Taylor v. Dunn*, 2018 WL 575670, at *18 (S.D. Ala. Jan. 25, 2018).

The Alabama Court of Criminal Appeals' application of Ala. R. App. P. 28(a)(10) to Boone's four above-noted claims constitutes an adequate and independent state procedural ground for denying relief. *Harris*, 489 U.S. at 264 n.10.  Alabama appellate courts have frequently applied Rule 28(a)(10) (and its predecessor, Rule 28(a)(5)) to find a waiver of arguments presented on appeal where an appellant has failed to offer specific legal authority, argument and adequate factual recitation to support the contention that the trial court's ruling was erroneous.[5] *See, e.g., Alonso*, 228 So.3d at 1108–10; *C.B.D. v. State*, 90 So.3d 227, 239 (Ala. Crim. App. 2011) ("Failure to comply with Rule 28(a)(10) has been deemed a waiver of the issue presented."); *Hamm v. State*, 913 So.2d 460, 486 & 490–91 (Ala. Crim. App. 2002); *Gay v. State*, 562 So.2d 283, 289 (Ala. Crim. App. 1990). Furthermore, federal habeas courts have routinely deemed claims to be procedurally defaulted where the state courts dismissed them pursuant to a Rule 28(a)(10) waiver. *See,*

---

[5] In order to bar federal review, the state procedural bar must have been "firmly established and regularly followed" at the time of the alleged default. *Ford v. Georgia*, 498 U.S. 411, 424 (1991).

*e.g.*, *James v. Culliver*, 2014 WL 4926178, *14 (N.D. Ala. Sep. 30, 2014) ("If a petitioner fails to comply with this rule, any issue(s) not briefed will be deemed to have been waived. . . . Moreover, Rule 28(a)(10), as well as its predecessor Rule 28(a)(1), were firmly established and regularly followed."); *Hamm v. Allen*, 2013 WL 1282129, at *19–21 (N.D. Ala. Mar. 27, 2013) (finding petitioner's claims procedurally defaulted where Alabama Court of Criminal Appeals found that such claims were waived due to petitioner's failure to comply with Ala. R. App. P. 28); *Bester v. Patterson*, 2013 WL 6191520 at *11–12 (N.D. Ala. Nov. 26, 2013) (same).

The express language of Rule 28(a)(10) makes clear that an appellant must list and explain the reasons for his claims.  Because Boone's Rule 32 appeal brief contained no argument supporting the four above-noted claims, the Alabama Court of Criminal Appeals reasonably held that they were waived for purposes of appellate review.  Consequently, these habeas claims are procedurally defaulted.

## Cause and Prejudice

A habeas petitioner can overcome a procedural default either through showing cause for the default and resulting prejudice, *Murray v. Carrier*, 477 U.S. 478, 488 (1986), or establishing a "fundamental miscarriage of justice," which requires a colorable showing of actual innocence, *Schlup v. Delo*, 513 U.S. 298, 324–27 (1995).[6]  Cause for a procedural

---

[6] Prisoners asserting actual innocence as a gateway to review of defaulted claims must establish that, in light of new evidence, "it is more likely than not that no reasonable juror would have found [the] petitioner guilty beyond a reasonable doubt." *Schlup*, 513 U.S. at 327.  Boone does not try to argue that the actual-innocence exception provides a gateway for review of his procedurally defaulted claims.

default must ordinarily turn on whether the petitioner can show that some objective factor external to the defense impeded efforts to comply with the state's procedural rules. *Murray*, 477 U.S. at 488; *United States v. Frady*, 456 U.S. 152, 170 (1982). Examples of such external impediments include a factual or legal basis for a claim that was not reasonably available, interference with the defense by government officials, or constitutionally ineffective assistance of counsel. *Murray*, 477 U.S. at 488. To establish prejudice, a petitioner must show that the errors worked to his "actual and substantial disadvantage, infecting his entire [proceeding] with error of constitutional dimensions." *Id.* at 494 (internal quotations and emphasis omitted).

As "cause" excusing his procedural default (i.e., the deficiencies in his Rule 32 appeal brief), Boone asserts that he was in administrative segregation and lacked access to the prison law library during the time for him to draft his brief, and that many of his important legal documents were confiscated by prison authorities at this time as well, although he does not specify which of his legal documents were confiscated. Doc. 13 at 7–9. Boone fails to show how his limited access to the prison law library hindered him from drafting an appellate brief setting forth arguments to support his claims or how the legal documents in question was required for him to draft a brief with arguments supporting his claims. Boone drafted the Rule 32 petition in which he first raised his claims and thus had actual knowledge of the factual basis for the claims, which he could have presented in his Rule 32 appeal brief but neglected to do. Although in a position to file an appellate brief with arguments at least as specific as those in his Rule 32 petition, he filed a brief

with several claims unsupported by any argument.  Further, as stated above, Boone did set forth one of his claims—his uncalled alibi witness claim—with sufficient specificity and supporting argument in his Rule 32 appeal brief.  It is not apparent why Boone could not also have complied with the requirements of Rule 28(a)(10) regarding his remaining claims, and thus his failure to provide supporting arguments for his remaining claims appears to have resulted from his own choices and not from any hindrances created by lack of access to the law library or his (unspecified) legal documents.  Because Boone fails to establish cause excusing his procedural default, his claims are foreclosed from federal habeas review.

Even if Boone could establish cause for his procedural default, he cannot establish prejudice arising from the default because he fails to demonstrate that his underlying claims are meritorious.  As to the first of these claims, Boone sets forth no persuasive argument and cites to no applicable case law establishing that his felony drug possession conviction could not have been introduced for impeachment purposes if he had taken the stand at his second trial. *See* Doc. 2 at 23–32.  Therefore, he does not show that his trial and appellate counsel were ineffective for failing to pursue this issue further.  Moreover, the jury at Boone's second trial heard a reading of Boone's testimony from his first trial, and the same jury was not informed of Boone's felony drug possession conviction.   Under the circumstances, Boone demonstrates no prejudice.

Boone was charged with and convicted of violating Alabama Code § 13A-5-40(a)(17), which makes it a capital offense to commit murder by use of a deadly weapon

while the victim is in a vehicle.  He claims that the trial court improperly amended the indictment when, in its jury charge, it instructed jurors that the defendant must have been outside the vehicle when shooting the victim in the vehicle.[7]  Doc. 2 at 32–36.  Even if the trial court's instruction added the requirement that the State must prove the defendant was outside the vehicle when shooting the victim, Boone has not shown how he was prejudiced by an instruction that raised the bar for the State.  Therefore, he also fails to show that he was prejudiced by his trial counsel's failure to object to the trial court's purported amending of the indictment.

Boone also claims that his trial counsel was ineffective for failing to argue that § 13A-5-40(a)(17) is unconstitutionally vague.  Doc. 2 at 37–43.  However, in *Dotch v. State*, 67 So.3d 936, 990–93 (Ala. Crim. App. 2010), the Alabama Court of Criminal Appeals confirmed the constitutionality of § 13A-5-40(a)(17).  Counsel cannot be ineffective for failing to do something for which there is no legal basis.  Accordingly, Boone fails to meet the *Strickland* test concerning this claim of ineffective assistance of counsel.  Moreover, Boone fails to show that § 13A-5-40(a)(17) is vague as applied to his own conduct and that the alleged vagueness was prejudicial to him.[8]  *See Catron v. City of St. Petersburg*, 658 F.3d 1260, 1271 (11th Cir. 2011).

---

[7] The statute provides: "(a) The following are capital offenses: . . . (17) Murder committed by or through the use of a deadly weapon while the victim is in a vehicle." Ala. Code § 13A-5-40(a)(17).

[8] In arguing that the statute is vague, Boone emphasizes that the Alabama legislature passed a joint resolution in 2006 opining that § 13A-5-40(a)(18), which addresses homicides during which a deadly weapon is fired from within a vehicle, was intended to apply only in cases in which "the motor vehicle was an instrumentality or otherwise involved in the shooting or that the shooting was gang-related." Ala. Act

(continued…)

Finally, Boone claims that his appellate counsel was ineffective for failing to argue that the trial court erred in allowing unreliable witness identification testimony. Doc. 2 at 43–52.  A petitioner who contends that an in-court identification violated his right to due process must demonstrate that a prior, unduly suggestive procedure tainted his identification. *See United States v. Wade*, 388 U.S. 218, 241 (1967); *Neil v. Biggers*, 409 U.S. 188, 199–200 (1972).  If the petitioner meets this burden, the reviewing court must then decide whether the in-court identification remained sufficiently reliable, under the totality of the circumstances, to avoid potential misidentification. *See Wade*, 388 U.S. at 241; *Biggers*, 409 U.S. at 199–200; *Gregory-Bey v. Hanks*, 332 F.3d 1036, 1045 (7th Cir. 2003).  Boone proves neither that an unduly suggestive out-of-court procedure tainted his identification as the person at the scene of the crime who shot the victim, nor that the in-court identifications of him as the shooter by various State's witnesses were unreliable. Consequently, he fails to show that his appellate counsel could have successfully pursued a claim that the trial court erred in allowing unreliable witness identification testimony.[9]

Boone fails to demonstrate prejudice as to any of his defaulted claims.  Therefore, the claims provide no basis for habeas relief.

---

No. 2006–642 (H.J.R. 575). *See* Doc. 2 at 38–41. However, that resolution cannot aid Boone, both because (1) the joint resolution does not have the force of law; and (2) the subject of the resolution is § 13A-5-40(a)(18), while Boone was convicted under § 13A-5-40(a)(17), which addresses a murder where the victim is killed inside a vehicle. *See Wilkerson v. Hetzell*, 2014 WL 4926160, at *3 (N.D. Ala. Sep. 30, 2014); *Morris v. Hetzel*, 2015 WL 590213, at *3 n.3 (M.D. Ala. Feb. 11, 2015).

[9] Jeffrey C. Duffey, who along with Susan G. James represented Boone at trial, also represented Boone on direct appeal.  Although much of the defense strategy at trial involved seeking to undermine the eyewitness identifications of Boone as the shooter and arguing that the photo lineup procedures identifying Boone were unduly suggestive, it is evident that Duffey decided that the pursuit of these arguments on appeal would not succeed.

### III.  CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that the petition for writ of habeas corpus under 28 U.S.C. § 2254 be DENIED and this case be DISMISSED with prejudice.

The Clerk of the Court is DIRECTED to file the Recommendation of the Magistrate Judge and to serve a copy on the petitioner.  The petitioner is DIRECTED to file any objections to this Recommendation on or before **September 14, 2018.**  Any objections filed must specifically identify the factual findings and legal conclusions in the Magistrate Judge's Recommendation to which the petitioner objects.  Frivolous, conclusive or general objections will not be considered by the District Court.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar a party from a *de novo* determination by the District Court of factual findings and legal issues covered in the report and shall "waive the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions" except upon grounds of plain error if necessary in the interests of justice.  11th Cir. R. 3-1; *see Resolution Trust Co. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989).

DONE this 31st day of August, 2018.

GRAY M. BORDEN
UNITED STATES MAGISTRATE JUDGE

43